Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice application forthcoming*)
Emily Gerrick
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| LAYER ZERO, and DAVID HUDSON, on behalf of themselves and all others similarly situated, | Case No. 3:23-cv-4023 |
| Plaintiffs, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| POLLEN MOBILE LLC, PRONTO.AI INC., ANTHONY LEVANDOWSKI, and CHRISTIAN KURASEK, | **Date: August 9, 2023** |
| Defendants. | |

**Preliminary Statement**

1.    In early 2022, Defendant Pollen Mobile LLC created something called a decentralized wireless ("DeWi") network. DeWi networks, as their name suggests, allow people to create wireless network coverage using their own radio antennae and wired internet connections. As with other networks, like Uber or Lyft, DeWi networks suffer from a cold-start problem: No one wants to spend the money to set up a radio antenna to provide coverage if there is no one to buy it, and no one wants to pay for service unless there is good, widespread coverage. To solve that problem, Pollen sold wireless providers radio equipment in exchange for actual money but paid them in Pollen Coin ("PCN"), a crypto token that Pollen minted from thin air and which it shortly thereafter sold to investors for cash as well. PCN is valuable only if the Pollen network is successful, which depends entirely on the efforts of Pollen. And although Pollen claimed in its technical documentation that PCN would have a fixed value of ten cents for use on the Pollen network, it admitted there and elsewhere that Pollen would be empowered to change that value. When it was sold to the public, including Plaintiff Layer Zero, PCN was a security. Pollen never registered or qualified PCN.

2.    By January 2023, Pollen evidently concluded that its original plan had not gone so well. Privately, Defendant Christian Kurasek, Pollen's CFO, described a business remarkably similar to Pollen's original plan as a "ponzi" scheme. Publicly, Pollen wrote that it was concerned about "the current regulatory environment" for "token-only projects." And so Pollen declared that all future payments to wireless providers would be in U.S. dollars and that PCN would be "pegged to the US Dollar . . . at a value of 1 $PCN : USD $0.10 for purposes of making purchases within the Pollen network." This time, Pollen was not empowered to change the peg. Afraid that its original "ponzi" scheme would cause problems in the "current regulatory environment," Pollen converted its securities to gift certificates.

3.    California Civil Code Section 1749.5 requires that "any gift certificate

with a cash value of less than ten dollars . . . [be] redeemable for its cash value." And so, on March 22, 2023, Plaintiff Layer Zero, alongside many others, demanded that Pollen exchange its PCN for U.S. dollars at ten cents apiece. Pollen refused. Plaintiff David Hudson made the same request on July 10, 2023, which was also refused. Instead, Pollen announced that it is starting a business called Pollen One, through which users can evidently create wireless coverage and buy it back from themselves. But Pollen explained that "[a]t this time we are not adding any new members to the Pollen Mobile network." And so Plaintiffs cannot use their PCN to buy data, rendering PCN useless in violation of the federal CARD act, which forbids selling gift cards that expire (absent exceptions that do not apply here).

4.      Plaintiff Layer Zero brings this action on behalf of itself and all other purchasers of wireless equipment from Pollen to rescind those sales or for rescissory damages under the federal and California securities laws. And Plaintiff David Hudson brings this action on behalf of himself and all other PCN holders to redeem his gift certificates and for actual and statutory damages under the federal and California gift card laws and the California Unfair Competition Law.

## Parties

5.      Plaintiff Layer Zero is a company composed of two corporate entities, Auzolan, Inc., and Superliminal, Inc., both headquartered in California. Layer Zero purchased approximately $ 233,548.16 worth of equipment and PCN from Pollen. See Ex. A. As explained below, Layer Zero moves to be certified as lead plaintiff in this action under the Private Securities Litigation Reform Act.

6.      Plaintiff David Hudson holds 1,059,799.71 useless PCN gift certificates that Pollen refused to redeem.

7.      Defendant Pollen Mobile LLC is a wholly owned subsidiary of Defendant Pronto.ai, Inc. Pollen is an LLC formed under the laws of Delaware and headquartered in San Francisco. Pronto is a corporation formed under the laws of

Delaware and headquartered in San Francisco.

8.    Defendants Anthony Levandowski and Christian Kurasek founded and control Pollen and Pronto. Both live in San Francisco.

## Jurisdiction and Venue

9.    This Court has subject-matter jurisdiction over this Action under 28 U.S.C. § 1331 because it arises under the laws of the United States and may exercise supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367. This Court also has subject-matter jurisdiction over this Action under 28 U.S.C. § 1332(d) because it is a putative class action seeking more than $5 million and because at least one plaintiff is a citizen of a different state than at least one defendant.

10.    This Court has general personal jurisdiction over all Plaintiffs and Defendants because they are all domiciled in California.

11.    Venue is appropriate in this district and division because the acts complained of took place in this district and division and because Defendants live or are headquartered in this district and division.

## Background on Decentralized Wireless Networks and Crypto Assets

12.    In 2015, the Federal Communications Commission adopted rules that authorized individuals to use the 3550–3700-megahertz band of electromagnetic spectrum, which had previously been reserved for the Navy, for private use. This band is colloquially known as the Citizens Broadband Radio Service ("CBRS") after the system the FCC created to govern the band.

13.    Although private individuals are permitted to use CBRS spectrum for any lawful and non-interfering purpose, the Navy retains priority over the spectrum. And so, to use CBRS spectrum, radio operators must use a Spectrum Access System ("SAS"), which ensures (among other things) that the Navy is empowered to interrupt any transmission.

14.    Shortly before the CBRS spectrum became available, a company called

Helium was formed. Helium sought to allow people to use CBRS spectrum to sell low-power wireless service (suitable for things like rentable scooters and other devices that do not need to transmit much data) from antennae on their homes and businesses.

15.    By 2017, Helium was running out of actual money to pay wireless operators, and the network was generally languishing. At the same time, the market for crypto assets was just starting to take off.

16.    A crypto asset is a form of digital asset based on a network that is distributed across a large number of computers. Bitcoin is the most well-known type of crypto asset. Different crypto assets are typically designated by three- or four-letter symbols, as stocks are. The network of computers that securely and publicly record the transactions of a given crypto asset is called a blockchain. There are many blockchains that record transactions of a variety of different crypto assets. (The blockchain chiefly at issue in this case is called Solana.)

17.    Helium's founders realized that they could use crypto assets to incentive people to set up wireless service even before any users of that service materialized. To do this, Helium minted a coin, HNT, on its own Helium blockchain, and set up a network by which early wireless providers would be rewarded with more HNT than later providers, breaking the cold-start problem. Helium then sold those providers wireless equipment from which to provide service to the public.

18.    Over time, Helium implemented a complex system called a burn-and-mint equilibrium whereby HNT was destroyed as users moved data through the Helium network. The purpose of a burn-and-mint equilibrium was to tie the long-term value of HNT to the amount of data actually purchased.

19.    Helium was remarkably successful at incentivizing people to set up wireless transmitters and earn HNT, but remarkably unsuccessful at getting anyone to use the service. By early 2023, Helium had a little under 100,000 active wireless

service providers who, over the proceeding 30 days, had transmitted exactly zero bytes of useful data for users. HNT, meanwhile, earned Helium's founders a small fortune even as it eventually collapsed in price, and the company made more than $53 million selling wireless equipment.

20.   Since Helium was founded, several other businesses have set up similar networks, some offering high-quality wireless service suitable for internet use, and others offering voice and text-messaging as well.

### Pollen's Original Business Plan

21.   In January of 2022, Pronto, a company that builds autonomous vehicles, wrote that it was inspired by Helium's "demonstrat[ion] that distributed ledger applications, a crypto-enabled incentive and payments system, open source technologies, and decentralized governance models can be harnessed to revolutionize the development and operation of physical world network." And so Pronto launched Pollen, which it described in a whitepaper as "the first privacy focused, anonymous, decentralized, 4G/5G, open source mobile network enabled by a crypto economy that is owned and operated by its users."

22.   Pollen uses the metaphor of flowers and pollination to explain its systems. Service providers plant "Flowers," which are wireless network antennae connected to the internet at the providers' homes or businesses, or on space they lease for this purpose. Flowers require electricity and an internet connection, which service providers pay for. In exchange for their cash payments and resource use, Flower owners are paid in PCN, issued by Pollen. Meanwhile, "Bumblebees" are paid PCN in exchange for validating whether Flowers are really providing high-quality coverage. Bumblebees require electricity and travel time—they work effectively only if they are validating coverage across the world (flying around pollinating flowers, in Pollen's lingo). "Hummingbirds" are the actual users of the network. Pollen simplified its network thusly:

1

2

3

4

5

6

7

8

9

10

11



12   23.   Specifically, Pollen wrote in its initial whitepaper, "Flowers are mobile

13   network antennas that are built to open standards. When connected to the internet,

14   Flowers provide wireless coverage and earn their owners PCN, Pollen's Solana token,

15   in return for the coverage provided and data hauled for end users . . . . Bumblebees

16   are small embedded Linux devices with built-in LTE and GPS antennas, used to

17   verify Flower network coverage. Bumblebees validate network coverage by reporting

18   Pollen network coverage statistics as they move through the physical world . . . .

19   Bumblebee owners are rewarded with PCN for their daily network validation

20   activities . . . . Hummingbirds are end user equipment, such as mobile phones, that

21   can utilize the Pollen network for mobile connectivity. In the US, CBRS and eSIM

22   [subscriber identification module] compatible devices will be able to download a

23   Pollen eSIM which will enable them to become a Hummingbird and connect to the

24   Pollen network."

25   24.   In its initial whitepaper, Pollen said that it planned to create three

26   entities to operate the network: "Pollen Opco" (Pollen's name for Pollen Mobile LLC)

27   would "guide development of and manage the network until other service providers

28

are engaged and control over the network is fully turned over to the Pollen community"; the "Pollen Foundation" would be a "a non-profit legal entity which will own all Foundation Banks [of PCN]"; and the "Pollen Enhanced Decentralized Autonomous Organization" would be "established to take over management responsibilities and ownership of the network and Foundation from Pollen Opco." No entity other than Pollen Mobile LLC was ever created.

25.     Instead, Pollen itself operated the "mobile core" underlying the Pollen network: "The Mobile Core," Pollen wrote, "is the collection of services that serve as the 'operating system' of a mobile network. The Mobile Core facilitates activities such as authenticating authorized devices / users on the network, tracking user data consumption, and routing data through the network. Pollen utilizes the open source Magma Core software platform, which will initially be managed by Pollen Opco (the initial Mobile Core Administrator)." Meanwhile, "[t]he Mobile Core Administrator"— which is Pollen itself—"will also be responsible for managing the Spectrum Access Service ('SAS') necessary to comply with the FCC's CBRS rules, as well as processing the per-Flower monthly payments charged by SAS providers."

26.     At its founding, Pollen created one billion PCN and programmed it so that no more could ever be issued.

27.     Pollen initially put 500 million PCN in something it called the "incentive bank," which was supposed to eventually be controlled by the Pollen Foundation. Because that foundation was never formed, Pollen itself controlled the incentive bank and used it to pay Flower and Bumblebee operators.

28.     Pollen then "earmarked" 150 million PCN for "outside investment in the network." These 150 million were to be sold "subject to a three-year vesting/lockup schedule." An additional 200 million PCN was reserved for a "sponsor pool." Those tokens too would be subject to the same vesting schedule.

29.     Pollen reserved the remaining 150 million PCN for an "ecosystem fund"

1  to pay "teams/partners providing critical services to the network."

2      30.    Pollen planned to start its network in three phases. In phase one, "Pollen

3  Opco will make Flowers and Bumblebees available for sale via the Pollen website

4  (www.pollenmobile.io). Flower and Bumblebee owners will begin earning PCN

5  rewards for providing and verifying network coverage, respectively. Pollen Opco will

6  make eSIMs available for purchase via the Pollen website (www.pollenmobile.io). . . .

7  Once an eSIM is imported into a CBRS-capable mobile device and it becomes a

8  Hummingbird, the owner will be able to begin utilizing the Pollen network and

9  *earning* PCN rewards for daily utilization. Hummingbirds will receive unlimited data

10  usage at no charge beyond the cost of the eSIM during this phase." (emphasis added).

11      31.    In other words, at the start of the network, users would be paid in PCN

12  to use the network, both to bootstrap use of the network and solve the cold-start

13  problem (or try to), and likely because Hummingbirds also validate coverage and

14  therefore provide a useful service to the network.

15      32.    During phase one, Pollen wrote, "Pollen Opco will fulfill the Mobile Core

16  Administrator functions in a largely centralized manner."

17      33.    Pollen set its system of incentive payments (which it paid out from the

18  incentive bank) to encourage early Flower and Bumblebee operators. "The purpose of

19  Incentive Payments," Pollen wrote, "is to provide an incentive for early adopters to

20  build, validate, and begin utilizing the network." At the beginning of phase one, "[t]he

21  500 million Incentive PCN will be distributed in regular base installments of 300,000

22  per day to Flower, Bumblebee, and Hummingbird owners to reflect their respective

23  contributions to the network."

24      34.    Pollen's incentive payments were calculated by multiplying the total

25  daily payout of PCN (which was set by Pollen) by the proportion of "Pollen Incentive

26  Credits (PICs)" a specific user earned that day to the total number of Pollen Incentive

27  Credits earned each day. Flowers earned 10 PICs every time their coverage was

28

validated by a Bumblebee, Bumblebees earned 1 PIC every time they validated a flower, and Hummingbirds earned 1 PIC every day they connected to the network. Initially, Pollen paid out 300,000 PCN per day. The process of earning PCN by operating Flowers, Bumblebees, and Hummingbirds was colloquially referred to as "mining" PCN.

35.     This system created a strong incentive to be an early adopter: If, for example, you owned the only Flower online in a given day, there was only one Bumblebee operating, and there were no Hummingbirds, you would earn 230,769 PCN. But as soon as one other Flower joined, you would earn only 130,434, and so on. At the same time, "[i]n order to provide an incentive to be an early participant in the network, the number of PCN paid out in daily Incentive Payments will halve at two milestones . . . when the Incentive Bank is 1/3 depleted . . . [and] when the Incentive Bank is 2/3 depleted."

36.     There was no rule, in the whitepaper or anywhere else, against owning both Flowers and Bumblebees. And there was no rule, in the whitepaper or anywhere else, against owning many Bumblebees and using them to validate the same coverage—one's own coverage, in fact—at the same time.

37.     Pollen wrote in its whitepaper that in phase two of its development, Hummingbirds would be required to purchase tokens called "data credits." One data credit would buy a user one gigabyte of data. Data credits would initially cost fifty cents apiece. And, Pollen wrote, "[i]nitially, the value of one PCN will be pegged to the US Dollar ('USD') at a value of 1 PCN : USD $0.10 for the purposes of purchasing Data Credits."

38.     If the price of PCN were truly fixed and the price of data credits were truly fixed, there would be no point at all to having two tokens: Pollen could simply have set the price of a gigabyte of data as five PCN.

39.     And if the price of PCN were truly fixed, Pollen's network would be at

risk of a pricing failure: If PCN holders were at any time unwilling to sell PCN for ten cents, the price of data could become too dear to sell effectively onto the market.

40.     Instead, the reason Pollen set its system up with two tokens was because the price of PCN *was not* fixed. Instead, Pollen wrote, "The price of PCN may be changed in the future by Pollen Opco."

41.     From the perspective of a prospective Flower or Bumblebee purchaser, then, Pollen offered the following straightforward transaction: Pay us cash for equipment; use that equipment at your own expense, by paying for electricity, internet, and travel; and, in exchange, we will pay you PCN, which will become valuable if and only if the Pollen network is successful. If the network is successful and eventually sells data to the public, the amount of PCN you will get paid will increase in proportion with the amount of data purchased by users on the network. And Pollen Opco is responsible for maintaining and expanding the network.

42.     Pollen itself put it this way, in a November 2, 2022, blog post: "The more you participate in the Pollen network, the more PCN you earn. *The larger and stronger the network, the higher the value of PCN.* All the profit that would otherwise go into the phone company's pocket stays in yours." (emphasis added).

43.     Immediately after writing this, in the same blog post, Pollen advertised a cyber-Monday discount on equipment it was selling for cash.

44.     One news report confirmed the public's understanding, putting it this way: "Instead of 'buy our device and start providing wireless coverage, and if a lot of people do that then people will use the coverage, and then maybe one day they'll pay you,' [Pollen's pitch] was 'buy our device and start providing wireless coverage, and we'll give you lots of tokens, and if this thing takes off then the tokens will be valuable and you'll be able to buy an island, for providing this wireless coverage in the early days of our network.' It was a way to turn this possibly useful service into also a *Ponzi scheme.*" Matt Levine, *DeWi Rug Pull*, BLOOMBERG, Jan. 26, 2023 (emphasis in

original).

45.     PCN was a security when issued. Investors purchased equipment in cash from Pollen that they used in a common enterprise with other purchasers and with Pollen to start a wireless-network business. In return, they were paid PCN by Pollen. Pollen *said* that they should expect "profits" from PCN, and they did, as any reasonable purchaser would; that's because the more successful the business is "the higher the value of PCN." And the value of PCN was dependent on Pollen's "largely centralized" management and promotion of the network.

**Pollen Sells and Encourages the Secondary Market Sale of PCN**

46.     In early 2022, Pollen began selling Flowers and Bumblebees to the public via its website, pollenmobile.io.

47.     When users made purchases on this website, they were not asked to check any box or otherwise indicate their assent to any contract.

48.     Pollen offered many different types of Flowers and Bumblebees. A "Moonflower," for example, cost $7,499.99, and a Sunflower cost $4,299.99. Bumblebees were generally less expensive, retailing for around $500.

49.     Even though Pollen represented in its whitepaper that Flowers were "built to open standards," Flowers and Bumblebees were sold with something called "firmware" installed on them. Because of this firmware, although the radios were technologically compatible with other networks, including Helium, users could not (and cannot) transfer them to other networks without Pollen's consent. Flowers and Bumblebees, then, are useful only in connection with Pollen.

50.     At around the same time that Pollen began selling equipment and PCN to the public, it sold PCN to wealthy investors on the side. Pollen structured these sales through two agreements. First, investors signed a Simple Agreement for Future Equity (SAFE), by which they would be entitled to a share of Pollen Mobile LLC's equity in proportion to their investment and the company's later valuation. Second,

investors signed a "token side letter agreement," by which they would be entitled upon the "generation" of PCN to their "pro rata share" of PCN issued to the investor pool. The "pro rata share" was calculated as "the proportion that (i) the outstanding Principal Amount of such SAFE then held by such Investor bears to (ii) the Valuation Cap of such SAFE." Tokens sold this way were subject to a three-year lock-up period. The agreement does not require that Pollen ever "generate" tokens, but of course Pollen planned to issue tokens when it created the side letter agreement—that was Pollen's whole business plan—and in fact it did generate tokens.

51.     In the token side letter agreement, Pollen wrote that each investor "has been advised that any Tokens may be considered a security and that the offers and sales of the Tokens may not [have] been registered pursuant to the securities Laws or similar Laws of any jurisdiction."

52.     Investors negotiated these agreements with Pollen with a focus on the price they paid per token, and Pollen did the same. For example, Kurasek explained to one investor over Telegram that although there was no "price" for PCN tokens, the investment would entitle the investor to a certain number of tokens at a certain price and also to equity in the company, which, Kurasek explained, entitled the investor to his proportional share of *Pollen's PCN tokens*.

53.     Adding together the tokens this way—the tokens to which investors would be entitled through the side-letter agreement and the tokens to which they would be entitled, per Kurasek's description, as equity holders in the company— investors paid exactly ten cents for each PCN token.

54.     This is remarkable. If the price of PCN were truly fixed at ten cents for data use on the network, selling them to investors for ten cents would of course make no sense. Instead, as Pollen well knew—and encouraged—investors were purchasing tokens as speculative investments whose value would go up, as Pollen itself said, if the network got larger and stronger.

55.   Altogether, Pollen sold approximately $6 million worth of PCN to early investors.

56.   In early 2022, the Pollen network began in earnest.

57.   Pollen's system can work only if earning PCN is a real "incentive" to provide coverage. And for that to be true, there needed to be a market for PCN—after all, people providing wireless coverage do not usually need a huge amount of PCN to buy wireless coverage from themselves, and when bona fide users of the network eventually materialized, they would need a place to buy PCN somewhere.

58.   In response to the obvious set of incentives created by Pollen, PCN holders created a discussion forum called an OTC channel, for over-the-counter sales of PCN, which was not listed on any crypto asset exchanges.

59.   Although Pollen needed a secondary market to exist, Pollen was rightly concerned that directly facilitating secondary-market sales of PCN would be legally risky. In May 2022, a PCN holder sent Kurasek a message on Telegram, a messaging application, reading: "Hey Christian, I want to set up the OTC a bit better. Care to have a chat? Want your blessing." Kurasek responded "We don't have any affiliation with the OTC channel, so no need to get our blessing." The PCN holder wrote back: "Got it. Any chance we could set up an official one? Or would that be legally an issue for you guys?" Kurasek wrote back: "would be an issue."

60.   But Pollen had *already* offered its "blessing" of over-the-counter sales. In March 2022, a Pollen investor exchanged messages with Pollen's chief operating officer. "OTC sales happening at around $.40 btw," the investor wrote. The COO responded with a smiley-face emoji. "Doing my best to create liquidity in the OTC channel by being a free escrow," he wrote. "Might be worth being in there as an anonymous if you're not already." To this the COO responded with a thumbs-up emoji, and then wrote "*Super appreciate it* . . . . How's it going so far?" (emphasis added), to which the investor responded "Facilitated maybe $50k in transactions."

61.   In February 2022, Kurasek exchanged messages with a user named Heliumly on Discord, a messaging service. The user wrote: "Hi, how can someone from Canada get involved at an early phase? . . . . its mentioned that pollencoin cannot be bought but mined what are other options if others want to buy the coins as an investor if network is not active in their region?" In response, Kurasek wrote "We may do a public coin sale at some point in the future, but we don't have any plans to at the moment. Once community members starting earning PCN, they will be free to trade them though!"

62.   A few days later, Kurasek again wrote that although Pollen won't itself "swap" PCN for U.S. dollars or any other currency, "the community will be free to swap PCN." In the same message exchange, a user named Chris wrote "I'm still pretty confused about the $.010 peg w/ PCN. Is the idea that the peg will probably be dropped if/when there's further clarity on the relevant securities law? Is there a possible future where Pollen Mobile LLC runs out of PCN and can't retain the peg?" To this, Kurasek wrote "Great questions. Regarding the peg, we're not maintaining it using 'open market operations' like the issue of a fiat currency would need to. Instead we're implementing it by setting the price at which PCN can be exchanged for Data Credits, which are non-transferrable. So with the initial price pegs, 1GB ($0.50) of data will cost five PCN ($0.10). We can't speculate on future prices of PCN, *but we/the community will have the ability to change the current pegs/prices.*" (emphasis added). To that, Chris wrote "Ok there's something I'm not wrapping my head around here, so I'm just going to ask kind of stupid questions until things click for me. Say I want some data credits to use the network. So that means I want some PCN, right? Where can I buy that PCN at the pegged price?" In response, Kurasek wrote "Not stupid questions—the current lack of regulatory clarity makes this a really thorny issue to navigate. We hope that once PCN Incentive Payments start getting pushed out into the world, folks who want to obtain them to pay for data in

Phase II will be able to swap with folks who have mined them via a Flower, Buttercup, or Hummingbird. We can't set the prices of the swaps happening between two third parties, but we do set the price of PCN for purposes of buying Data Credits for use on the Pollen network."

63.     In June of 2022, the price of PCN on the OTC market took off. Although PCN was supposedly fixed at ten cents, it was trading for a tiny bit under 40 cents by mid-June 2022.

64.     In September of 2022, Kurasek attended the Messari Mainnet conference in New York. Many Pollen investors were there as well. At the conference, Kurasek told at least two of those investors that the price of PCN—which was then trading on the secondary market at about 17 cents—would likely go up because the network was growing well and the project was generally successful. Kurasek discussed the "tokenomics"—a portmanteau, perhaps obviously, of "token" and "economics"—of PCN with investors.

65.     In October 2022, Kurasek exchanged messages on Signal, a messaging service, with a Pollen investor. Kurasek explained that at a recent conference in Las Vegas he told the crowd that Pollen was "getting ready to launch international service." When the investor wrote that he and other investors were "plotting to take PCN to the moon" Kurasek responded "I have a responsibility to take PCN to the moon!" (In crypto jargon, "to the moon" is a common phrase used to describe rapid and large price increases.)

**Kurasek Describes the Original Business Model as a "Ponzi" And Pollen Decides to Leave PCN Holders Holding The Bag**

66.     From the beginning, Pollen has emphasized that its goal is to get "paid data" flowing through the network—that is, data for which users have actually paid, as they would in a real business. In an October 2022 interview, Kurasek said that his goal is to "get paid data flowing through the network as soon as possible. If we don't

do that, then this has just been a fun crypto project."

67.    By early 2023, Kurasek and Levandowski had a change of heart about PCN. They realized, as they later put it in a blog post, that "[c]onsumers and businesses want to pay for services in US dollars." The idea that regular users would decide to "swap" PCN via over-the-counter sales in order to buy a product that the most Americans use every day started to seem implausible.

68.    And so Pollen announced in a March 6 blog post that "we're . . . introducing the US dollar as i) the primary means to purchase data and / or plans from Pollen, and ii) the means in which Flower owners will be paid for hauling data." "The value of $PCN will remain $.010" but "Customers will be able to pay for a portion of purchases in PollenCoin ($PCN), for example, up to 25% per purchase." In this blog post, Pollen wrote that it was concerned about "the current regulatory environment" for "token-only projects." Pollen subsequently changed the blog post to allow users to pay for their data in PCN alone.

69.    Pollen simultaneously issued a new whitepaper to replace the original one. The new whitepaper read: "The value of $PCN has been and continues to be pegged to the US Dollar ('USD') at a value of 1 $PCN : USD $0.10 for purposes of making purchases within the Pollen network (i.e., has no cash value). (For the avoidance of doubt, $PCN is not a 'stablecoin'.) Pollen customers will be able to pay for a portion (e.g., up to 25%) of data, subscription, hardware, etc. purchases in $PCN. $PCN may also be integrated with partner programs." In this updated whitepaper, Pollen deleted the phrase "The price of PCN may be changed in the future by Pollen Opco."

70.    Under the new plan, Flower operators would be paid in dollars, not PCN. Flower operators would be paid 80% of the value of the data they sold to users and Pollen would keep 20% to defray the costs of operating the mobile core and to keep some profit. And users would get one free gigabyte of data per month.

71.     But an ambiguity remained—if Flower operators were paid in dollars but users could buy data using PCN, would Pollen effectively exchange PCN for dollars? First, the answer appeared to be "no." In a message on slack, Pollen's COO wrote "If someone pays 100% PCN, the Flower owner will get 80%. If someone pays 100% USD, the Flower owner will get 80%. If someone pays their bill in 50% PCN, and 50% USD, the Flower owner will get 80% of 50%, PCN and 80% of 50% in USD. If someone does not pay (i.e. they did not use more than 1GB), then they did not pay anything and so there is nothing to give the flower owners." But in a conversation with a different user the COO wrote that "we only pay out in USD." Users were, of course, confused. And so finally the COO clarified: "[I]f someone pays 80% in PCN and 20% in USD, the Flower owner gets 80 of the 20," appearing to suggest that Pollen's plan was to allow people to take free data from Flower owners in exchange for PCN.

72.     Pollen investors were, to put it mildly, not pleased with the new plan. From their perspective, Pollen minted PCN and sold it to them as an incentive to build a wireless network: If that network became successful, Pollen had contended, the only way to use that network would be to buy PCN, giving PCN value. After all, Pollen had specifically told investors that "[t]he larger and stronger the network, the higher the value of PCN." But once the users spent money on equipment from Pollen and on resources to power the network, Pollen pulled the rug out from under their feet by changing the plan to allow network users to buy data with dollars instead of PCN, completely disincentivizing the use of PCN. The price of PCN, of course, immediately collapsed. It is now effectively worthless.

73.     Privately, Kurasek explained his change of heart. He wrote in a private text message, after Pollen had announced its decision to switch to U.S. dollar payments, and in response to criticism: "[T]he easiest thing to have done this week would have been to have continued the con that helium is doing and pretending that

everything is ok and everybody can make money by deploying [c]brs radios in their dorm rooms. [W]e chose the hard, honest path, and we're being punished for it. [S]o fuck it, good luck everybody."

74.     In this conversation, Kurasek wrote that "we did the hard shit where we had two of our big investors asking for their money back after the announcement . . . because we refused to ponzi this shit . . . . [S]o at this point I'm like fuck all this shit, let everybody go down with the helium ponzi tried to warn you good luck bye . . . . [A]ll this has done [no]thing but reinforce my personal belief that crypto should be regulated as securities, and that's why we've always operated under that assumption—the dumb fucks like dawgnutz [a Helium participant] are always going to have their life savings scammed by people like amir and tushar [Helium founders]."

75.     Later in the conversation, the Pollen user wrote that when the current whitepaper is lined up next to the original "[t]he most recent looks like a lawyer inserted a ton of new stuff." Kurasek responded "well that's true because we had to. [W]e anticipated people being angry that we weren't going to support a ponzi scheme."

76.     A few days after that, Kurasek explained that he's a "huge fanboy" of Matt Levine, an author at Bloomberg. Levine, Kurasek wrote, "essentially reiterated that helium is a Ponzi and what we're doing is the inevitable outcome for anybody who wants to build a real business." But Levine had also noted that *Pollen* was a Ponzi scheme. Describing the "inevitable" outcome that Kurasek quoted, Levine wrote: "So a natural thing to do is, as your network grows, you say 'okay fine you can just pay for our service using a credit card like a normal person.' But then . . . what are the tokens for? Nothing, the answer is nothing. You used a *Ponzi scheme* to build a real service, and then you ran the real service like a regular business. What happens to the token holders?"

77.     Although throughout the conversation Kurasek tried to distance Pollen's *current* business model from the "Ponzi" scheme that Helium is operating, by

doing so he effectively admitted that Pollen's *original* business plan was a Ponzi scheme too: after all, Pollen wrote in its original whitepaper that "Helium . . . demonstrated that distributed ledger applications, a crypto-enabled incentive and payments system, open source technologies, and decentralized governance models can be harnessed to revolutionize the development and operation of physical world networks."

### Pollen Converts PCN to Useless Gift Certificates

78.    Since its original announcement adopting U.S. dollar payments, Pollen has—despite intense criticism from its users—maintained its plan to allow users to purchase data in dollars or PCN and to pay Flower operators in Pollen or PCN.

79.    On March 9, 2023, Pollen introduced "Pollen One." The details are sparse, but the plan appears to be to allow users to plant Flowers to create coverage primarily *for themselves*. "Pollen coverage is created by you," Pollen wrote on its new website for Pollen One. "Plant a Flower . . . and get coverage right where you need it."

80.    Pollen One users get one free gigabyte of data per month. After that, they pay $3 per gigabyte until they hit ten, after which they get unlimited data.

81.    Flower owners, meanwhile, are "eligible to receive a payout (80% of the USD payment) for the data that they haul for . . . subscriber[s]." And users can pay their bill in PCN if they want.

82.    At the moment, there are no actual Pollen One users. And indeed Pollen is not currently "adding any new members to the Pollen Mobile network," although Pollen contends they might in the future.

83.    And, at the moment, there are almost no Flowers from which a PCN holder could even in theory buy data. According to Pollen's "explorer," a website where users can monitor the Pollen network, as of May 12, 2023, there were only 460 Flowers online anywhere in the United States.

84.     Regardless, the Pollen One business plan is designed to leave PCN useless. If PCN holders set up Flower for their own use, paying in PCN does them no good—at best (and even this is unclear) they get their own paid-for data back and 80% of their PCN. If PCN holders somehow find other Flowers from which they can buy data in PCN, no conceivably reasonable Flower operator would sell data to them—even assuming Pollen pays out 80% of the PCN (which it does not appear to be planning to do), the Flower owner would be stuck with PCN, which is useful only for buying data, which by definition the Flower owner already has.

85.     PCN, then, expired on March 9, 2023, when Pollen announced a plan that rendered them useless.

**Pronto.ai, Levandowski, and Kurasek Control Pollen Mobile LLC**

86.     Pronto currently owns all of Pollen Mobile LLC's membership interests and completely controls its operations.

87.     Indeed Pollen and Pronto have operated as a single business without observing any material corporate formality.

88.     Pronto sent invoices for Pollen products from Pronto and with instructions to pay Pronto.

89.     Pollen contracts for work on the Pollen network were actually paid by Pronto, and the contracts themselves were between the contractor and Pronto, suggesting that Pollen and Pronto do not keep separate accounts, or at the very least that that they comingle operational funds.

90.     Pollen's key employees are also Pronto employees, including general counsel and all senior management, and Pollen has no independent office space.

91.     In official agreements with investors, Pollen wrote that "Founders" means both the executive officers of Pollen and of Pronto, and the documents are signed "Pollen Mobile LLC . . . by Pronto.ai, Inc."

92.     Recently, Pronto sent an email to at least one equity investor in Pollen

explaining that in the future they were planning to further separate Pollen from Pronto, suggesting that they are insufficiently separated today.

93. Meanwhile, Levandowski and Kurasek fully control both Pollen and Pronto.

94. Levandowski and Kurasek are the founders and managers of both companies and exercise all day-to-day decisionmaking.

<u>**Plaintiffs' Transactions**</u>

95. Plaintiff Layer Zero purchased approximately $ 233,548.16 worth of equipment from Pollen Mobile since March 2022 in order to earn Pollen PCN tokens. Ex. A. The only use for the equipment was to mine PCN. Like all investors who bought equipment from Pollen to mine PCN, Layer Zero made these purchases because it relied on statements from Pollen about the company's plans to grow the network and thus increase the value of PCN.

96. Layer Zero currently holds approximately 2,261,854.95 Pollen PCN tokens that it earned by operating its equipment since March 31, 2022. Ex. A. Layer Zero's PCN is now worthless.

97. Plaintiff David Hudson currently holds 1,059,799.71 PCN that Pollen has refused to exchange for its cash value of ten cents per token.

<u>**Class Action Allegations**</u>

98. Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23.

99. Plaintiffs propose to certify the following classes:

100.   "Federal Securities Class": All persons who obtained, earned, or purchased PCN on or after August 9, 2022.

101.   "California Securities Class": All persons who obtained, earned, or purchased PCN on or after August 9, 2021.

102.   "Gift Certificate Class": All persons who currently hold PCN.

103.   These classes easily satisfy the requirements under Rule 23 for the certification of a class action, known respectively as numerosity, commonality, typicality, adequacy, predominance, and superiority. Although ascertainability is not a separate requirement of class actions, this class is in fact easily ascertainable.

104.   First, on information and belief, well more than 50—likely several hundred—people or entities currently own PCN. By May 10, 2022, Pollen Mobile had already sold over 1,500 units that had only one purpose: mining PCN. There are far too many class members to efficiently litigate the claims separately; numerosity is therefore satisfied.

105.   Second, common questions of fact and law abound in this matter, including, but not limited to, whether PCN was a security prior to March 9, 2023, and whether PCN became a gift certificate on March 9, 2023.

106.   Third, Plaintiff's claims are typical of those of the class members: Layer Zero earned PCN by using equipment that it purchased from Pollen Mobile, and Hudson currently holds PCN.

107.   Fourth, Plaintiffs will adequately represent the class in this matter because they have no known conflicts of interest with other class members, because their claims are typical of those of the class, and because they will vigorously and diligently prosecute this matter. Plaintiffs' choice of class counsel, Gerstein Harrow LLP, is an experienced class action firm that will adequately protect the interests of absent class members.

108.   Sixth, a class action is a superior way—indeed the only practical way—

to proceed in this matter. There are many people who have earned PCN and still hold PCN, each with identical claims to the other members of their class or classes, and there are no practical obstacles to noticing them and proceeding on their behalf as a class. Forcing each to proceed individually, on the other hand, would be impractical and a severe waste of judicial resources.

109.    Finally, although this is not a standalone requirement, this class is easily ascertainable. Because PCN transactions occur on the blockchain, it is easy to ascertain which cryptocurrency wallets hold PCN and to then send a message to those wallets to notice their owners of this action. And Pollen of course has records of who purchased equipment and for how much money.

## Claims for Relief

### Count One: Unregistered Offer and Sale of Securities in Violation of Sections 5 and 12(a)(1) of the Securities Act of 1933 (Against Pollen Mobile LLC) (On Behalf of Layer Zero and Federal Securities Class)

110.    Plaintiffs incorporate all prior paragraphs by reference.

111.    15 U.S.C. § 77*l*(a)(1) provides that "any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."

112.    15 U.S.C. § 77e(a) (Section 5(a) of the '33 Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

113.    15 U.S.C. § 77e(c) (Section 5(c) of the '33 Act) states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of

transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

114.   When issued pursuant to the system described in Defendants' first whitepaper, PCN tokens were securities within the meaning of Section 2(a)(1) of the '33 Act, 15 U.S.C. § 77b(a)(1).

115.   During the class period, Defendants sold PCN tokens to Layer Zero and the Class Members.

116.   Defendants sold PCN tokens both by selling tokens directly and by paying Layer Zero and Class Members in PCN tokens in exchange for building out the Pollen network with a self-interested financial motive.

117.   Defendants therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

118.   No registration statements have been filed with the SEC or have been in effect with respect to the offering of PCN tokens.

119.   Accordingly, Defendants violated Section 5 of the '33 Act, 15 U.S.C. §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), 15 U.S.C. § 77l(a)(1).

120.   As a direct and proximate result of Defendants' unregistered sale of securities, Layer Zero and members of the class have suffered damages in connection with their respective purchases of PCN.

*Count Two: Control Person Liability Under Section 15 of the Securities Act of 1933 (Against Pronto.ai, Levandowski, and Kurasek) (On Behalf of Layer Zero and Federal Securities Class)*

121.    Plaintiffs incorporate all prior paragraphs by reference.

122.    Section 78t(a) of the Securities Act of 1933 provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

123.    Defendant Pronto.ai owns all of Pollen Mobile LLC's membership interests and completely controls its operations. Pollen and Pronto have operated as a single business without observing any material corporate formality.

124.    Defendants Levandowski and Kurasek founded and control Pollen and Pronto.ai, with Levandowski serving as the CEO of both companies and Kurasek serving as the CFO of both companies.

125.    Defendants Pronto.ai, Levandowski, and Kurasek are all "control persons" under § 78t who knew of and caused Pollen to violate the Securities Exchange Act. They are therefore jointly and severally liable for any violations of the Act.

*Count Three: Offer and Sale of Unqualified Securities in Violation California Corporations Code Sections 25110 and 25503 (Against Pollen Mobile LLC) (On Behalf of Layer Zero and California Securities Class)*

126.    Plaintiffs incorporate all prior paragraphs by reference.

127.    California Corporations Code § 25110 states: "It is unlawful for any person to offer or sell in this state any security in an issuer transaction (other than

in a transaction subject to Section 25120), whether or not by or through underwriters, unless such sale has been qualified under Section 25111, 25112 or 25113 (and no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification) or unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part."

128.   California Corporations Code § 25503 states: "Any person who violates Section 25110 . . . shall be liable to any person acquiring from them the security sold in violation of that section."

129.   When issued pursuant to the system described in Defendants' first whitepaper, PCN tokens were securities within the meaning of the California Corporations Code.

130.   During the class period, Defendants sold PCN tokens to Plaintiff and the Class members.

131.   Defendants sold PCN tokens both by selling tokens directly and by paying Plaintiff and Class members in PCN tokens in exchange for building out the Pollen network with a self-interested financial motive.

132.   No qualification or registration documents have been filed with the California Department of Corporations or have been in effect with respect to the offering of PCN tokens.

133.   Accordingly, Defendants have violated Section 25110 and 25503 of the California Corporations Code.

134.   As a direct and proximate result of Defendants' unqualified sale of securities, Plaintiffs and members of the class have suffered damages in connection with their respective purchases of PCN.

***Count Four: Control Person Liability Under California Corporations Code § 25504 (Against Pronto.ai, Levandowski, and Kurasek) (On Behalf of Layer Zero and California Securities Class)***

135.   Plaintiffs incorporate all prior paragraphs by reference.

136.   Section 25504 of the California Corporations Code states that "[e]very person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, [and] every employee of a person so liable who materially aids in the act or transaction constituting the violation . . . who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person" unless the person "had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

137.   Defendant Pronto.ai owns all of Pollen Mobile LLC's membership interests and completely controls its operations. Pollen and Pronto have operated as a single business without observing any material corporate formality.

138.   Defendants Levandowski and Kurasek founded and control Pollen and Pronto.ai, with Levandowski serving as the CEO of both companies and Kurasek serving as the CFO of both companies.

139.   Defendants Pronto.ai, Levandowski, and Kurasek are all "control persons" under § 25504 who knew of and caused Pollen to violate § 25501. They are therefore jointly and severally liable for any violations of § 25501.

***Count Five: Sale of Expiring Gift Cards in Violation of the CARD Act 15 U.S.C. § 1691l-1(c) (Against Pollen) (On Behalf of David Hudson and Gift Certificate Class)***

140.   Plaintiffs incorporate all prior paragraphs by reference.

141.   Under U.S.C. § 1691l-1(c), it is "unlawful for any person to sell or issue a gift certificate . . . that is subject to an expiration date" that is earlier than "5 years after the date on which the gift certificate was issued."

142.   15 U.S.C.§ 1693*l*, defines a "gift certificate" as an "electronic promise that is—(i) redeemable at a single merchant or an affiliated group of merchants that share the same name, mark, or logo; (ii) issued in a specified amount that may not be increased or reloaded; (iii) purchased on a prepaid basis in exchange for payment; and (iv) honored upon presentation by such single merchant or affiliated group of merchants for goods or services." 15 U.S.C. § 1693*l*-1(a)(2)(A), (B), (C).

143.   In March 2023, Pollen converted PCN into a gift certificate redeemable for a specified fixed amount (10 cents) of data from the Pollen network. Plaintiff and Class members had purchased PCN either by buying them directly or by purchasing equipment from Pollen or affiliates of Pollen and using that equipment to earn PCN from Pollen by providing Pollen with real-estate access, electricity, data backhaul, and other valuable things that Pollen needed in order to grow its network.

144.   Pollen then stopped "adding any new members to the Pollen Mobile network," preventing holders of the PCN gift certificates from redeeming them for data. By doing so, Pollen effectively made it so that the PCN gift certificates had expired.

145.   Thus, Defendants violated 15 U.S.C. § 1691l-1(c) and are liable for actual and statutory damages, costs, and attorney fees under the Electronic Fund Transfer Act.

***Count Six: Violation of California's Business and Professional Code § 17204 For Unlawful Business Practices (Against Pollen)  (On Behalf of David Hudson and Gift Certificate Class)***

146.   Plaintiffs incorporate all prior paragraphs by reference.

147.   California's Unfair Competition Law (the "UCL") prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.* Under Section 17204 of the act, "any person who has suffered injury in fact and has lost money or property" as a result of the

unlawful, unfair, or fraudulent acts may bring an action on behalf of themselves and others similarly situated. Cal. Bus. & Prof. Code § 17204.

148.    Defendants acts and practices constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of the UCL. Defendants engaged in the unlawful business acts and practices set forth above by selling unregistered securities and by selling gift certificates subject to an expiration.

149.    In addition, Defendants engaged in unlawful acts by refusing to allow Plaintiff and Class members to redeem their PCN gift certificates for their cash value of ten cents, in violation of Cal. Civ. Code § 1749.5 ("[A]ny gift certificate with a cash value of less than ten dollars ($10) is redeemable in cash for its cash value.").

150.    Defendants also engaged in unfair business practices by enticing Plaintiff and Class members to spend their own money to benefit Pollen under false pretenses. Defendants enticed Plaintiff and Class members to purchase equipment from them and use that equipment to "mine" PCN using the equipment—as well as real-estate, electricity, data backhaul, and other things of value at Plaintiff's and Class members' own expense—with the false promise that the PCN would be valuable because customers would be required to use PCN to buy data from the Pollen network. Defendants even encouraged people to buy equipment to use on the Pollen network even after they had secretly decided that they would later change the business model to allow customers to purchase data with U.S. dollars.

151.    As a result of Defendants' unlawful and unfair actions, Plaintiff and Class members have suffered damages, including the money they spent on real-estate access, electricity, data backhaul, and now-useless equipment purchased from Pollen and others.

## **Prayer for Relief**

### (Jury Trial Demanded)

Plaintiffs Layer Zero and David Hudson respectfully request that the Court:

152.    Certify the proposed class, the named Plaintiffs as class representatives, and the undersigned counsel as class counsel, and allow Plaintiffs and the class to have trial by jury;

153.    Enter judgment against all Defendants, jointly and severally, and in favor of Plaintiffs and the class, awarding rescission or rescissory or other available damages as defined by relevant law;

154.    Award reasonable attorneys' fees, costs, expenses, prejudgment and postjudgment interest, to the extent allowable by law;

155.    Award any other relief deemed just and proper.

Respectfully submitted,

*/s/ Jason Harrow*
Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice application forthcoming*)
Emily Gerrick
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

*Attorneys for Plaintiff*